RICK L. SHACKELFORD (SBN 151262)
DANIELL K. NEWMAN (SBN 242834)
RYAN C. BYKERK (SBN 274534)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California  90067
Tel: (310) 586-7700; Fax: (310) 586-7800
E-mail: *ShackelfordR@gtlaw.com*
        *NewmanDK@gtlaw.com*
        *BykerkR@gtlaw.com*

Attorneys for Plaintiff, Lifeway Foods, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFEWAY FOODS, INC., an Illinois corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>MILLENNIUM PRODUCTS, INC., d/b/a GT'S KOMBUCHA / SYNERGY DRINKS, a California corporation; COCOKEFIR LLC, a Delaware limited liability company,<br><br>        Defendants. | Case No.  2:16-CV-07099<br><br>**PLAINTIFF LIFEWAY FOODS, INC.'S *EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE, FOR TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Complaint Filed:  September 21, 2016<br>Trial Date:          None Set |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that, pursuant to Rule 65 of the Federal Rules of Civil Procedure, Rule 65-1 of the Local Rules of this Court, Plaintiff Lifeway Foods, Inc. ("Lifeway"), hereby moves *ex parte* for Preliminary Injunction, or in the alternative, for Temporary Restraining Order, to prevent Defendant Millennium Products, Inc., d/b/a GT's Kombucha / Synergy Drinks and Defendant CocoKefir LLC (collectively "Defendants") from selling, marketing or advertising its misbranded "CocoKefir" products in any forum, including prohibiting Defendants from launching and thereafter exhibiting, displaying, marketing, advertising, demonstrating, sampling, discussing, selling or otherwise referencing or referring to the misbranded "CocoKefir" at the Natural Products Expo East 2016 tradeshow ("Expo East") on September 22-24, 2016. Lifeway applies *ex parte* to have the instant application heard on shortened time because Lifeway will be harmed if Defendants are permitted to market and sell their illegally misbranded products at Expo East and thereafter. Lifeway will likewise be irreparably harmed if Defendants are allowed to continue to distribute their misbranded "CocoKefir" products anywhere aside from Expo East.

The events at issue are as follows:

(1)     Lifeway has learned that Defendants are marketing a misbranded product styled as "CocoKefir," which Defendants wrongfully advertise as being the dairy product Kefir, when in fact it is simply probiotic-enhanced non-dairy coconut water with other additives, and does not contain any milk from animals at all;

(2)     Under the regulations of the U.S. Federal Food and Drug Administration ("FDA") setting forth the standard of identify for cultured milk products, including specifically Kefir, such products necessarily are produced by the fermentation of animal milk from cows, sheep or goats;

(3)     In 2011, the FDA formally warned those marketing "CocoKefir" that FDA was concerned that the product's name misleads consumers into

1

mistakenly believing that the "CocoKefir" product is cultured animal milk when it is not;

(4)   As set forth in Lifeway's *Ex Parte* Application for Preliminary Injunction, or in the Alternative, Temporary Restraining Order, Lifeway is the leading U.S. producer of the popular cultured milk product known as Kefir;

(5)   Defendants have already been distributing their misbranded "CocoKefir" in this district, and have been attempting to leverage that distribution by advertising the product through social media. However, Defendants are planning to create a national market for their misbranded "CocoKefir" products by launching them at the Expo East trade show, to be held this year in Baltimore, Maryland from Thursday, September 22, 2016 through Saturday, September 24, 2016. Expo East is one of the two premier annual trade shows for natural products, including Kefir products, in the United States. Product manufacturers market their products to retailers and resellers at Expo East and the orders made during the show will determine in large measure the amount of product (and attendant shelf space) that will be available for sale in stores during the next year;

(6)   If Defendants are permitted to market their misbranded "CocoKefir" products at Expo East and thereafter, Lifeway will certainly lose orders and shelf space to Defendants' misbranded "CocoKefir" products.

Accordingly, Lifeway respectfully requests that the Court hear Lifeway's *Ex Parte* Motion for Preliminary Injunction, or in the Alternative, Temporary Restraining Order on September 22, 2016.

Alternatively, Lifeway respectfully requests that the Court issue a Temporary Restraining Order and/or Preliminary Injunction preserving the status quo and restraining

2

Defendants and their officers, agents, servants, employees, attorneys, confederates, related entities, and all persons who are in active concert or participation with them from:

    (a) Selling, marketing, advertising or distributing their misbranded "CocoKefir" products through any outlet for purchase by consumers;

    (b) launching the "CocoKefir" product at Expo East or in any other public venue; and,

    (b) thereafter, exhibiting, displaying, marketing, advertising, demonstrating, sampling, discussing, selling or otherwise referencing or referring to the "CocoKefir" products before the Court has fully adjudicated the issue of whether the "CocoKefir" products are misbranded or not, because if they are misbranded, they cannot lawfully be sold as a Kefir products anywhere in the United States.

This Application is based on this Notice, the attached Memorandum of Points and Authorities and the accompanying Declaration(s) of Derek Miller, Douglas A. Hass and Rick L. Shackelford, and all such other material that the Court may properly consider in ruling on this Application.

Dated: September 21, 2016      GREENBERG TRAURIG, LLP


By: _____*/s/ Rick. L. Shackelford*_____
        Rick L. Shackelford
        Daniell K. Newman
        Ryan C. Bykerk
        Attorneys for Plaintiff
        Lifeway Foods, Inc.

## I.      **INTRODUCTION**

The case involves renewed efforts by Defendants Millennium Products, Inc. and CocoKefir LLC, (collectively "Defendants") to promote and sell a bogus Kefir product that Defendants peddle as "CocoKefir."   Whatever else it may be, the product is not Kefir, because it contains no dairy, and thus, by definition, cannot be Kefir.  Accordingly, the product is misbranded and cannot lawfully be sold without violating 403 (a)(1) of the Food, Drug and Cosmetic Act, 21 U.S.C. §343(a)(1).

Plaintiff Lifeway Foods, Inc. ("Lifeway") is the nation's leading manufacturer of genuine ("cultured milk") Kefir products.  Lifeway's Kefir products are all made with cow's milk, and as such meet the definition of "Kefir" set forth in 21 C.F.R. § 131.112 (a) as a "cultured milk product."  Lifeway brings this action to prevent Defendants' bogus "CocoKefir" from entering the marketplace, diluting the market for genuine, lawfully-branded Kefir products, and causing harm to Lifeway.

Lifeway further brings this request for a preliminary injunction or alternatively for a temporary restraining order to prevent the misbranded "CocoKefir" product from being sold through existing outlets, and from ever being launched or offered for sale to a national market.  Specifically, based on the timing of Defendants' advance publicity, it appears it plans to launch the bogus "CocoKefir" product at the Expo East Natural Foods trade show in Baltimore, Maryland, which opens on September 22, 2016.  The Expo East trade show is one of the two major trade shows in the United States featuring natural, organic and sustainably-produced products and, as such, is one of the major vehicles for food companies to generate "buzz" for new products and connect with potential retail customers.  Thus, it is necessary to restrain Defendants from ever launching "CocoKefir" because of the imminent harm doing so would create for genuine Kefir products.

Lifeway knows whereof it speaks because consumer comments about this soon-to-be-introduced product show that consumers think "CocoKefir" is genuine Kefir and not just non-dairy coconut water.  For example, one such consumer said of the misbranded "CocoKefir" product, "*The kefir looks so good*."  This is not the first time the bogus

4

"CocoKefir" product has appeared.  Several years ago, the then-owners of the brand sold "CocoKefir" in interstate commerce through retail stores.  While it was in market, the bogus "CocoKefir" product cut into sales of genuine Kefir products, including those made by Lifeway.  Indeed, "CocoKefir" harmed authentic Kefir brands the entire time it was on the market.  But that time was relatively short-lived, because the Food & Drug Administration ("FDA") sent "CocoKefir's" manufacturer a warning letter in November, 2011, which, among other things, warned that the "CocoKefir" product was misbranded precisely because it did not contain any actual dairy products, and therefore did not meet the legal definition of "Kefir."  Not long thereafter, the "CocoKefir" product disappeared from the market.

But now, under new ownership, the same bogus product is back.  Lifeway has suffered once from having to compete with an illegally misbranded product; it should not have to do so again.  The Lanham Act and California state law both permit a court to restrain or enjoin acts of unfair competition (including the promotion or sale of misbranded foods) based on the same showing.  This Court should exercise that power now and prevent Act Two of this misbranded product's life cycle from ever getting underway.

## II.   FACTUAL BACKGROUND

### A.   Legal Definition of Kefir

Kefir, by definition, is a cultured milk product that is made with a combination of cultured milk, Kefir grains (a combination of grains, extract and lactic acid bacteria) and other ingredients that are aged in order to produce an end product with higher levels of probiotics compared to non-cultured products.  Genuine Kefir can be made from the milk of cows, goats or sheep but, by definition, the milk must come from animals.

The FDA has established a legal definition of cultured milk in 21 C.F.R. § 131.112(a):

(a) *Description.* **Cultured milk is the food produced by culturing one or more of the optional dairy ingredients specified in**

**paragraph (c) of this section with characterizing microbial organisms.** One or more of the other optional ingredients specified in paragraphs (b) and (d) of this section may also be added. When one or more of the ingredients specified in paragraph (d)(1) of this section are used, they shall be included in the culturing process. All ingredients used are safe and suitable. **Cultured milk contains not less than 3.25 percent milkfat and not less than 8.25 percent milk solids** not fat and has a titratable acidity of not less than 0.5 percent, expressed as lactic acid. The food may be homogenized and shall be pasteurized or ultra-pasteurized prior to the addition to the microbial culture, and when applicable, the addition of flakes or granules of butterfat or milkfat.

Section 131.112 (emphasis added).

The common and usual name of fermented milk products made in accordance with these definitions is "cultured milk."  As set forth in 21 C.F.R. § 131.112(f), the term "Kefir" may be used to describe products meeting the legal definition of cultured milk. The regulation states:

(f) *Nomenclature.* The name of the food is "**cultured milk**". The full name of the food shall appear on the principal display panel in type of uniform size, style, and color. The name of the food shall be accompanied by a declaration indicating the presence of any characterizing flavoring as specified in 101.22 of this chapter, and may be accompanied by a declaration such as a traditional name of the food or the generic name of the organisms used, thereby indicating the presence of the characterizing microbial organisms or ingredients, **e.g., "kefir cultured milk"**, "acidophilus cultured milk", or when characterizing ingredients such as those in paragraphs (d) (6), (7), (8), and (9) of this section, and lactic acid-producing organisms are used the food may be named "cultured buttermilk".

Section 131.112(f) (emphasis added).

Thus, not all cultured milk products are described as "Kefir," but all genuine Kefir products must meet the definition of cultured milk products.  To do so, they must be made from animal milk and contain the requisite levels of milk fat that comes from animal milk and not from other sources.  Thus, by definition, a genuine Kefir product

6

must contain milk from animals; no animal milk, no Kefir.  Any product called Kefir that does not contain animal milk is misbranded.

## B.    The Bogus "CocoKefir" Product

"CocoKefir" was launched in 2009 as a purported Kefir product.  At the time, the brand was owned by CocoKefir LLC.  By November 2011, it had caught the attention of the FDA based on its illegal marketing claims.  In addition, the FDA informed CocoKefir LLC that the product was misbranded because it did not meet the legal definition of Kefir.  The FDA's warning letter stated:

> We are concerned that the brand name of the product, **"CocoKefir," may potentially be misleading because it appears to imply that the product is a dairy beverage. Use of bolding and an alternate font makes the word "Kefir" appear more prominently featured than the word "Coco."**  "Kefir" is commonly understood to be a dairy beverage of fermented milk from cows, sheep, or goats.[1]

This "common understanding" is not only a U.S. legal definition, but also a well-recognized worldwide definition.  At the joint direction of the United Nations' Food and Agriculture Organization ("FAO") and World Health Organization ("WHO"), representatives of more than 180 countries, including the United States, have undertaken to implement food standards in order to "protect[ ] consumers' health and ensur[e] fair practices in the food trade." Codex Alimentarius Comm'n, Procedural Manual, at 20 (23rd ed. 2013).  The result of these representatives' efforts is the authoritative Codex Alimentarius, a well-respected registry of food definitions and regulations.  The Codex definition of Kefir is almost identical to that of the FDA:

> ***Fermented Milk*** is a milk product obtained by fermentation of milk, which milk may have been manufactured from products obtained from milk with or without compositional modification as limited by the provision in Section 3.3, by the action of suitable microorganisms and resulting in reduction of pH with or without coagulation (iso-electric precipitation). These starter microorganisms shall be viable, active and

---

[1] http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm281492.htm.

*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

abundant in the product to the date of minimum durability.  If the product is heat treated after fermentation the requirement for viable microorganisms does not apply.

Certain Fermented Milks are characterized by specific starter culture(s) used for fermentation as follows:

....

**Kefir**: Starter culture prepared from kefir grains, Lactobacillus kefiri, species of the genera Leuconostoc, Lactococcus and Acetobacter growing in a strong specific relationship. Kefir grains constitute both lactose fermenting yeasts (Kluyveromyces marxianus) and non-lactose-fermenting yeasts (Saccharomyces unisporus, Saccharomyces cerevisiae and Saccharomyces exiguus).

Codex Stan 243-2003, § 2.1.

Like the FDA, the Codex sets minimums standards for the presence of dairy ingredients, in this case limiting non-dairy ingredients to 50%:

***Flavoured Fermented Milks*** are composite milk products, as defined in Section 2.3 of the General Standard for the Use of Dairy Terms (CODEX STAN 206-1999) which contain a maximum of 50% (m/m) of non-dairy ingredients (such as nutritive and nonnutritive sweeteners, fruits and vegetables as well as juices, purees, pulps, preparations and preserves derived therefrom, cereals, honey, chocolate, nuts, coffee, spices and other harmless natural flavouring foods) and/or flavours. The non-dairy ingredients can be mixed in prior to/or after fermentation.

Codex Stan 243-2003, § 2.3.  And, just as in the FDA regulations, the "milk" from which Kefir is made must come from animals, not non-dairy sources like coconuts.

Milk is the normal mammary secretion of milking animals obtained from one or more milkings without either addition to it or extraction from it, intended for consumption as liquid milk or for further processing.

Codex Stan 206-1999, § 2.1.

8

## C.    **CocoKefir Resurfaces**

Defendants have apparently recently acquired the "CocoKefir" brand.  According to the U.S. Patent and Trademark Office, the entire interest in the intellectual property rights associated with the brand was assigned to Millennium in March 2016.[2]

The owner may be new, but the 'CocoKefir" product is not.  It is not genuine Kefir, but merely coconut water enhanced with probiotic bacteria and a non-caloric, non-nutritive sugar substitute, stevia extract.  "CocoKefir" now comes in at least three flavors.  "CocoKefir Cacao" contains the following ingredients:  "young coconut water; probiotic cultures; raw cacao; stevia extract; and 100% pure love."  The "CocoKefir Matcha" flavor contains: "young coconut water; probiotic cultures; ceremonial matcha; stevia extract; and 100% pure love."  The "CocoKefir Pure" flavor contains: "young coconut water; probiotic cultures; stevia extract; and 100% pure love."  None of the flavors contains any dairy or milkfat.  Indeed, the labels even boast that the products are "Vegan."[3]  [Declaration of Rick L. Shackelford, at Exhibits 1, 2 and 3.]  All three flavors

---

[2] The Court may take judicial notice of Exhibit 1 to this Memorandum because, as filings with the U.S. Patent and Trademark Office ("PTO"), they are matters of public record whose accuracy is not subject to reasonable dispute, since their validity can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, i.e., the records of the PTO.  Fed. R. Evid. 201(b) (court may take judicial notice of facts "not subject to reasonable dispute" where they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Sorenson v. Fein Power Tools*, No. 09cv558 BTM (CAB), 2009 U.S. Dist. LEXIS 89105, *1 n. 1 (S.D. Cal. Sept. 28, 2009) (taking judicial notice of PTO documents).

[3] Although there is currently no definition of "vegan" established by regulation, the common dictionary definition of vegan applies only to foods that do not contain dairy or animal products.  "vegan," Merriam-Webster Online Dictionary, 2016, http://www.merriam-webster.com, Sept. 21, 2016 (*noun*: "a strict vegetarian who consumes no animal food **or dairy products**….") (emphasis added).  Thus, by definition, one can no more have a "vegan kefir" than one could have a "vegan filet mignon."  "Vegan kefir" is oxymoronic.

*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

1    of this misbranded product are available for purchase by consumers in Los Angeles,

2    albeit at the exorbitant price of $10 per 16.2 ounce bottle, at the Café Gratitude.[4]

3        Beginning in September 2016 (or before), Defendants began strategically

4    "leaking" information about their "CocoKefir" products through influencers on social

5    media.  Specifically, information about the "CocoKefir" products began appearing on

6    Instagram under the handle "shutthekaleup," maintained by food blogger and consumer

7    influencer, Jeannette Ogden, in which she claimed she had purchased "CocoKefir" at a

8    Café Gratitude location.  Ms. Ogden is an example of an "influencer;" influencers have

9    large social media followings and frequently receive compensation from companies to

10   post on social media about their products in order to create consumer interest for those

11   products.  In other words, influencers' social media accounts contain a mix of both paid

12   and unpaid content. Content like the posts for "CocoKefir" are a form of advertising.

13       The Instagram posts and video/photo montages (called "Instastories") featured

14   pictures of the misbranded "CocoKefir" product, showing it to be the same in all respects

15   as the former product.  Notably, the product again communicated Kefir in an unqualified

16   manner.

17   **(SPACE INTENTIONAL TO ACCOMMODATE IMAGES THAT FOLLOW)**

---

[4] Moreover, the "Cacao" and "Matcha" flavors list only "probiotic cultures," but do not
identify the strains of bacteria used as the purported "probiotics."  Unlike the "Pure,"
flavor, the labels for "Cacao" and "Matcha" do not identify anywhere what strains of
bacteria are used; instead, they are merely described as "a proprietary probiotic blend."
Accordingly, these flavors are further misbranded in violation of 21 CFR §101.4(b), due
to the failure to identify the name of ingredients in the products.

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

The Instagram post and the comments thereto reflect just the kind of reactions Defendants were hoping for:

- "it's kefir so it's an interesting taste.. I'm drinking it though cause it's so good for our gut!"
- "The kefir looks so good"
- "it's interesting since its kefir but good for the gut so I'm in!"
- "I bought the kefir in matcha favor yesterday. Scared to try it tho. Lol"
- "I'm eying that coco kefir . . . need to find that when I'm home."
- "That cocokefir sounds absolutely delish I must try."
- "whaaaaat I wanna try the cocokefir."
- "Nooo way. I have to try the cocokefir."
- "Can we spend our Sunday trying to find this cacao coco kefir?"
- "I need to find that cocokefir."
- "Been dyinggg for some coco Kefir!!  So excited GT makes it. ..But now I have to find it."
- "The kefir looks so good"
- "Your candid response to the kefir is exactly what I thought it would be... 'It's actually disgusting.'"
- "I'm still drinking it! so good for us!"
- "kefir helps with sealing your gut and if you have a healthy gut everything else should be in line."

[True and correct copies of the comments to Ms. Ogden's Instagram post are attached as Exhibit 2 to the accompanying declaration of Derek Miller.]

This is exactly the kind of "buzz" a company pays for.  It is cheap, fast, and affords a real world platform to place before retailers in order to persuade them to carry a new product.  These comments plainly show that consumers mistakenly think "CocoKefir" is genuine Kefir, not the non-dairy coconut water fortified with probiotics that it actually is.

The confusion Defendants are fostering on social media would justify the relief Lifeway is seeking all by itself.  But it is not all by itself.  Instead, Defendants appear to be planning to get their "new" misbranded "CocoKefir" product before a group of buyers at a new product forum at the Natural Products Expo East 2016 trade show.  Millennium Products is participating in a "Natural Products Buyers Mission," billed as a way for companies to "meet with pre-qualified buyers from around the world in pre-arranged, one-on-one meetings" to "generate new sales leads, and build relationships with key industry players."[5]  This forum with a captive audience is a bit like "speed dating" for manufacturers to persuade buyers for all kinds of retailers – large chains, specialty stores, health food stores, etc. – to take a chance on a new product.  The kind of "buzz" generated by paid social media posts like those of "shutthekaleup" is critical to persuading other retailers (beyond the Café Gratitude) to devote scarce shelf space to something like "CocoKefir."  Often that scarce shelf space, and certainly inventory dollars, for such products comes at the expense of genuine Kefir products like those produced by Lifeway.

Once Lifeway learned of Defendants' efforts to launch the misbranded "CocoKefir" product, Lifeway took steps to learn whether the brand's new owners had learned anything from the FDA's 2011 warning letter with regard to the misbranding of the product.[6]  In particular, Lifeway tried to learn whether this "new" product contains

---

[5] https://www.foodexport.org (follow "Programs & Services" hyperlink; then follow "Buyers Mission" hyperlink; then follow "Natural Products Buyers Mission at 2016 Natural Products Expo East")

[6] It is apparent that Defendants did not learn any lessons from the warning letter.  In addition to the warning about "Kefir," the FDA also warned that "CocoKefir" was misbranded because of the "serving size" stated in the product's nutrition facts panel.  The FDA's warning letter stated: "FDA has determined that your CocoKefir Young Coconut Kefir product is misbranded within the meaning of Section 403(q) of the Act [21 U.S.C. 343(q)] in that the Nutrition Facts panel shown on your website fails to properly declare the serving size as required by 21 CFR 101.9(b) and 101.12(b).  Specifically, serving sizes are determined based on the Reference Amounts Customarily Consumed

*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

sufficient milk to meet the standard of identity for a cultured milk product.  It attempted to deliver a cease and desist letter to Defendants calling out the misbranding.  Defendants had a perfect opportunity to respond to that letter and set the record straight if, in fact, their new product was not misbranded.  But Defendants refused to sign for the registered letter, and failed to respond to the version of the same letter delivered via email.  All available information is that this "new" product is the same misbranded "CocoKefir" that the FDA addressed in its letter in 2011, but now is being marketed by a different owner.  "CocoKefir" has no milk.  It is misbranded.  It cannot be lawfully sold.  Accordingly, all further sales of this misbranded product should be enjoined, and the "launch" of this bogus product should be aborted now, before any more consumers are deceived and thereby harmed by purchasing fake "Kefir," and before Lifeway loses any sales or shelf space to it.

## III.    LEGAL ARGUMENT

### A.    Misbranded Food Products Cannot Be Legally Sold

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*., as amended by the Nutrition Labeling and Education Act of 1990 ("NLEA"), 21 U.S.C. § 343 *et seq*., 21 U.S.C. § 343 establishes the conditions under which food is considered "misbranded." Food is misbranded under 21 U.S.C. § 343(a)(1) if "its labeling is false or misleading in any particular."  Misbranded products cannot legally be sold, and are even subject to being seized.  21 U.S.C. § 331(a) (prohibiting in interstate commerce "any food…that is…misbranded"); *id.* at § 332(a) (federal courts have authority to grant injunctive relief to enforce the FDCA); *id.* at § 334(a) (federal courts have authority to order seizure of misbranded products); *see also CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007) (sale of misbranded goods unlawful).  As

(RACC), which are provided in 21 CFR 101.12(b). The Nutrition Facts panel for your CocoKefir Young Coconut product declares the serving size as "1/2 cup," but based on the RACC for beverages, the serving size is 8 oz. (240 ml)." [Miller Decl., Ex. 1.] The "serving size" on the "CocoKefir" currently in market is still listed as "1/2 cup." [Shackelford Decl., Exs. 1-3.]

*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

1  described above, the FDCA sets forth the specific standard of identity for cultured milk
2  products like Kefir, including the (rather obvious) requirement that cultured milk be
3  dairy, not non-dairy.  "CocoKefir" does not satisfy that standard of identity and cannot be
4  legally sold as "Kefir" in the United States.

5        **B.**     **California's Sherman Law And The Lanham Act Entitle Companies To**
6              **Sue Competitors For The Sale Of Misbranded Food Products.**

7        The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety
8  Code § 109875 *et seq*., incorporates the requirements of the FDCA as the food labeling
9  requirements of the state of California.  Courts in this state have repeatedly affirmed the
10  principle that a requirement imposed by state law that effectively parallels or mirrors the
11  relevant sections of the FDCA may be enforced by private action in California.  *See e.g.*
12  *In Re Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1084, n.5 (2008); *Brazil v. Dole*
13  *Food Co., Inc.*, 12-CV-01831-LHK, 935 F. Supp. 2d 947, 2013 U.S. Dist. LEXIS 42026,
14  2013 WL 1209955 (N.D. Cal., Mar. 25, 2013) (holding that the FDCA did not preempt
15  identical provisions under the Sherman Law); *Kosta v. Del Monte Corporation*, 12-cv-
16  01722-YGR, 2013 U.S. Dist. LEXIS 69319, 2013 WL 2147413 (N.D. Cal., May 15,
17  2013) (same).   A competitor, in particular, has an interest in bringing an action to insure
18  that misbranded foods are not sold, particularly where such sale will cause the innocent
19  competitor harm.

20        Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) also authorizes an action
21  against a competitor for misbranding or false advertising, which action is completely
22  distinct from an action under the Sherman Law to enforce a violation of the FDCA.  As
23  the United States Supreme Court held in *POM Wonderful LLC v. Coca-Cola Co.*:

24          [T]he FDCA and the Lanham Act complement each other in the federal
25          regulation of misleading food and beverage labels. Competitors, in their
           own interest, may bring Lanham Act claims [] that challenge food and
26          beverage labels that are regulated by the FDCA.

27  *POM Wonderful LLC v. Coca-Cola Co,* 134 S. Ct. 2228, 2233 (2014).

28

The Supreme Court held that a competitor has the right to pursue an action against a competitor who "[makes a] false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, qualities, or geographic origin of [] goods, services, or commercial activities." *Id*. at 2234. "This principle reflects the Lanham Act's purpose of protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition." *Id*. (internal quotations omitted). It is under this principle that Lifeway brings the instant action.

### C.   Lanham Act Authorizes Injunctive Relief.

Under the Lanham Act, once a violation of the statute is demonstrated, injunctive relief can issue. 15 U.S.C. § 1125(a); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992) (injunction proper for product falsely advertised as rice-based when it was not made with rice); *Playtex Prods. v. P&G*, 2004 U.S. Dist. LEXIS 14084 (S.D.N.Y. July 26, 2004); The Supreme Court has recognized the importance of equipping companies with the ability to enjoin a competitor's deceptive labeling, rather than relying solely on the FDA to police the marketplace. *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. at 2239 ("Because the FDA acknowledges that it does not necessarily pursue enforcement measures regarding all objectionable labels, if Lanham Act claims were to be precluded then commercial interests—and indirectly the public at large—could be left with less effective protection in the food and beverage labeling realm than in many other, less regulated industries." (footnote omitted)).

### D.   Injunctive Relief Is Necessary Here To Prevent Defendants From Creating A Market For Their Misbranded Products

Injunctive relief is necessary and appropriate here: Defendants, with full knowledge that their products are deceptively mislabeled, have introduced the products into the consumer market already. In addition, Defendants intend to launch "CocoKefir" at Expo East. Accordingly, for the protection of Lifeway's market, brand and goodwill, Lifeway seeks and is entitled to injunctive relief requiring Defendants to immediately

18

*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

1   cease the advertising, sale and distribution of "CocoKefir" and all other non-dairy

2   products that purport to be or incorporate the name Kefir.

3          To be entitled to injunctive relief Lifeway must establish: (1) that it is likely to

4   succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of

5   preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that the

6   injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am.,*

7   *Inc.*, 609 F.3d 975,982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*,

8   129 S.Ct. 365,374 (2008)).   "[T]he elements of the preliminary injunction test are

9   balanced, so that a stronger showing of one element may offset a weaker showing of

10  another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

11  As shown, the facts here easily satisfy this test.

12                **1.    Lifeway is likely to prevail on the merits.**

13         In order to obtain a preliminary injunction, Lifeway must show that its claim is

14  likely to succeed on the merits.   Based on the evidence already adduced, this is a

15  straightforward proposition.   First, Lifeway must show unlawful conduct by a competitor,

16  which is shown by virtue of the misbranded "CocoKefir."   *See Southland Sod Farms v.*

17  *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).   Then Lifeway must show a

18  "likelihood of confusion" on the part of a substantial number of consumers.   This, too,

19  has been shown by virtue of the consumer "comments" in response to social media posts

20  advertising the "CocoKefir" product.   Consumers plainly believe it is Kefir and not just

21  enhanced coconut water.   This evidence that Defendants' advertising has already

22  produced the desired effect is more than sufficient to establish likely confusion and

23  shows that Lifeway is likely to succeed on its claim.

24                **2.    Lifeway is likely to suffer irreparable and imminent harm in the**

25                       **absence of preliminary relief.**

26         Unless Defendants are enjoined, Lifeway will immediately suffer irreparable harm.

27  "Grounds for irreparable injury include loss of control of reputation, loss of trade, and

28  loss of good will." *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 510

19

(D.N.J. 2014) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004)).  "To demonstrate irreparable harm in a Lanham Act case, a party 'must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a logical causal connection between the alleged false advertising and its own sales position.'"  *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 518 (S.D.N.Y. 2013) (quoting *CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011)).

First, Lifeway and Defendants are competitors in the marketplace.  Lifeway is the leading manufacturer of genuine Kefir products in the United States, and Defendants have begun marketing and will soon formally launch misbranded products that falsely purport to be Kefir.  These products compete for the same scarce shelf space in retail stores, as well as for consumers seeking genuine Kefir.

Second, there is a logical, causal connection between Defendants' false advertising and Lifeway's sales position.  Defendants have already been distributing the "CocoKefir" products on a limited basis, and they intend to launch and aggressively advertise their deceptive and misleading "CocoKefir" products at Expo East beginning Thursday, September 22, 2016 through Saturday, September 24, 2016.  The Natural Products Expo East is "the East Coast's leading trade show in the natural, organic and healthy products industry, attracting over 25,000 industry professionals and 1,900 exhibits to the Baltimore Convention Center."[7]  It is the natural product industry's "second-largest conference and an important venue for established brands and young brands just getting their start," and it purports to be "one of the biggest events for spotting new trends and seeing brands in action."[8]  The event is marketed to retailer buyers, brokers, distributors, health practitioners, suppliers, manufacturers, press members, bloggers, and business

[7] http://www.expoeast.com/ee16/public/enter.aspx (follow "Register" hyperlink; then follow "Why Attend" hyperlink).
[8] Natural Products Expo East 2016 Flash Facts: Trends, Themes & Growth, http://www.expoeast.com/ee16/CUSTOM/uploads/EXPOEAST2016_Media%20Alert%20FINAL.pdf.

20

consultants.[9]

Expo East is an important trade show because retailer buyers, distributors, and others, will make long-term purchasing decisions for their clients during Expo East. Expo East organizers urge retail buyers to attend because they "will find the newest and best natural, organic and healthy lifestyle products to stock your shelves, increase your margins and meet the needs of your store patrons."[10]   Distributors are urged to attend because they "will find the newest and hottest products shaping the future of the natural, organic and healthy lifestyle marketplace."[11]   Health practitioners are urged to attend because the "will find the newest and hottest products shaping the future of the natural, organic and healthy lifestyle marketplace."[12]   In short, attendees of Expo East will make decisions at Expo East that will greatly impact the natural food market for months.

Defendants' intended launch of "CocoKefir" at Expo East is likely to deceive reasonable consumers, including retailer buyers, brokers, distributors, and other Expo East attendees, into believing the "CocoKefir" non-dairy product is genuine Kefir, creating a market for Defendants' misbranded products.  Defendants' products, which are not Kefir, will compete for shelf space with Lifeway's genuine Kefir.   Defendants' conduct will confuse consumers who purchase "CocoKefir" reasonably believing they are getting genuine Kefir products when they are not.  Unless enjoined, Defendants will obtain a wrongful and unfair competitive advantage, because they will undercut Lifeway's market at Expo East (where Lifeway is also exhibiting), causing Lifeway to lose sales of its genuine Kefir to Defendants' misbranded non-dairy coconut water. Unless Defendants are enjoined, retailer buyers, brokers, distributors, and eventually,

---

[9] http://www.expoeast.com/ee16/public/enter.aspx (follow "Register" hyperlink; then follow "Why Attend" hyperlink).

[10] http://www.expoeast.com/ee16/public/enter.aspx (follow "Register" hyperlink; then follow "Why Attend" hyperlink; then follow "I'm a Retail Buyer" hyperlink).

[11] http://www.expoeast.com/ee16/public/enter.aspx (follow "Register" hyperlink; then follow "Why Attend" hyperlink; then follow "I'm a Broker or Distributor" hyperlink).

[12] http://www.expoeast.com/ee16/public/enter.aspx (follow "Register" hyperlink; then follow "Why Attend" hyperlink; then follow "I'm a Health Practitioner" hyperlink).

consumers will be confused during and after Expo East, the meaning of genuine Kefir will be diluted, and Lifeway will lose the goodwill associated with thirty years of creating, developing and marketing its Lifeway Kefir brand.  Lifeway is the company that first brought Kefir to the United States.  Lifeway created the market for Kefir and the loss of thirty years' of goodwill in the marketplace would be irreparable for Lifeway.  Moreover, this loss of goodwill and market share is imminent.  It will begin at Expo East, or as soon thereafter as the product is introduced, but will have far-reaching effects that will be difficult or impossible to measure.  If unchecked, Lifeway's harm will grow and worsen as "CocoKefir" achieves greater distribution through multiple channels beyond Café Gratitude.

### 3.    The balance of equities tips in Lifeway's favor.

The harm to Lifeway in this matter is irreparable, for the reasons explained above, and thus, the balance of equities tips in its favor.  But moreover, Defendants here would suffer no legally recognizable harm, because the requested relief is narrowly tailored to enjoin only the marketing and distribution *of an unlawful product*, in which Defendants have no legal or legitimate interest in selling in the first instance.  Even assuming Defendants would suffer harm – and to be clear, they would not – any such harm would be compensable via monetary damages.  Thus, on balance, this factor militates in favor of entering the requested injunction.

### 4.    The injunction is in the public interest.

An injunction against the sale of a non-Kefir product that is deceptively named and labeled "CocoKefir" is in the public interest because it would prevent the sort of consumer confusion and deception in the marketplace (of the type already evidenced by the above-detailed Instagram comments), and it would protect Lifeway's goodwill in the marketplace.  *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006) ("an injunction against the sale of counterfeit [goods] would advance two fundamental purposes of trademark law:  preventing consumer confusion and

*EX PARTE* APPLICATION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

deception in the marketplace and protecting the trademark holder's property interest in the mark").

### E. A Temporary Restraining Order Is Justified Based On Defendants' Willful Conduct

As set forth above, the requirements of a preliminary injunction are met.  But because of the immediate, ongoing nature of Defendant's intentional marketing and imminent launch of a mislabeled product, in the event the Court is unable to hear Lifeway's *Ex Parte* Motion for Preliminary Injunction on September 21, 2016, Lifeway seeks a temporary restraining order in the alternative preserving the status quo and restrain Defendants and their officers, agents, servants, employees, attorneys, confederates, and all persons who are in active concert or participation with them from displaying, marketing, selling, demonstrating, sampling, discussing or otherwise referencing or referring to the misbranded "CocoKefir" product at Expo East or in any other public venue before the Court has fully adjudicated the issue of the salability of the misbranded "CocoKefir" product.

Under Rule 65 of the Federal Rules of Civil Procedure, an *ex parte* temporary restraining order may issue if the plaintiff, in addition to showing it is entitled to a preliminary injunction (set forth above), can also demonstrate:

> (A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. Proc. 65; *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir.2001).

Lifeway has met the requirements for a preliminary injunction, as discussed above.  Lifeway has also met the additional requirements of Rule 65.  The declarations Lifeway has submitted in support of this motion show that Lifeway, and the public, will suffer

immediate and irreparable injury if a temporary restraining order is not issued. Defendants' launch of bogus Kefir products at Expo East will immediately damage Lifeway's goodwill in the marketplace, harm retailers who purchase Defendants' bogus "CocoKefir" drink, and ultimately, harm consumers who are deceived by Defendants' mislabeled products.  The damage to Lifeway's market and goodwill is immediate and irreparable, and will occur as soon as "CocoKefir" is introduced.  The damage will continue thereafter and will persist as long as the misbranded "CocoKefir" products are offered for sale anywhere in the United States.  Because Lifeway only learned of Defendants' planned launch of their misbranded products on September 13, 2016, and the launch is scheduled to take place on September 22, 2016, the damage will result to Lifeway before Defendants can be heard in opposition.

## **CONCLUSION**

On the basis of the foregoing, Lifeway respectfully urges this Court to grant its *ex parte* application for preliminary injunction against Defendants.

Dated:  September 21, 2016          GREENBERG TRAURIG, LLP


By:  _____*/s/ Rick. L. Shackelford*_____
              Rick L. Shackelford
              Daniell K. Newman
              Ryan C. Bykerk
              Attorneys for Plaintiff
              Lifeway Foods, Inc.

24

EXHIBIT 1

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM375364

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| CocoKefir LLC | | 03/02/2016 | LIMITED LIABILITY COMPANY: MINNESOTA |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | CocoKefir, LLC |
| Street Address: | 4646 Hampton Street |
| City: | Vernon |
| State/Country: | CALIFORNIA |
| Postal Code: | 90058 |
| Entity Type: | LIMITED LIABILITY COMPANY: DELAWARE |

## PROPERTY NUMBERS Total: 4

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 3982768 | TULA'S |
| Registration Number: | 4564160 | COCOYO |
| Serial Number: | 86691955 | BELLY BOOST |
| Serial Number: | 86801644 | COCOKEFIR |

## CORRESPONDENCE DATA

**Fax Number:**

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Phone: | 212-504-2060 |
| Email: | adam@gglaw.us |
| Correspondent Name: | Adam L Marsh |
| Address Line 1: | 411 West 14th Street |
| Address Line 4: | New York, NEW YORK 10014 |

| NAME OF SUBMITTER: | Adam Marsh |
|---|---|
| SIGNATURE: | /Adam Marsh/ |
| DATE SIGNED: | 03/02/2016 |

**Total Attachments: 5**
source=CocoKefir - Trademark Assignment - Fully Executed#page1.tif
source=CocoKefir - Trademark Assignment - Fully Executed#page2.tif

OP  $115.00  3982768

source=CocoKefir - Trademark Assignment - Fully Executed#page3.tif

source=CocoKefir - Trademark Assignment - Fully Executed#page4.tif

source=CocoKefir - Trademark Assignment - Fully Executed#page5.tif

## ASSIGNMENT OF DOMAIN TRADEMARKS, DOMAIN ADDRESSES & GOODWILL

**WHEREAS,** COCOKEFIR LLC, a Minnesota limited liability company having an address of 716 Tower Drive, Medina, MN 55340, (hereinafter referred to as "<u>Assignor</u>") has registered two (2) trademarks, which are listed in the United States Patent and Trademark Office as set forth on the attached Schedule A (hereinafter referred to as "<u>Registered Marks</u>"), has applied for Federal registration of two (2) trademarks, which are listed in the United States Patent and Trademark Office as set forth on the attached Schedule A (hereinafter referred to as "<u>Applied Marks</u>"), and uses in commerce one (1) trademark which it has not applied for or registered with the United States Patent and Trademark Office as set forth on the attached Schedule A (the "<u>Use Mark</u>"; together with the Registered Marks and the Applied Marks, the "<u>Marks</u>") and is the owner of six (6) internet domain names or accounts associated therewith, which are set forth in the attached Schedule B (hereinafter referred to as "<u>Domains</u>");

**WHEREAS,** CocoKefir, LLC, a Delaware limited liability company having a place of business at 4646 Hampton Street, Vernon, California 90058 (hereinafter referred to as "<u>Assignee</u>") is desirous of acquiring any and all rights that Assignor may have in and to the Marks and the registrations thereof, together with the goodwill of the business in connection with which the Marks are used and which is symbolized by the Marks, along with the right to recover for damages and profits for past infringements thereof; and whereas Assignee is further desirous of acquiring any and all rights that Assignor may have in and to the Domains, including renewal, ownership, and administrative rights thereof or any accounts associated therewith;

**NOW THEREFORE,** for good and valuable consideration, receipt of which is hereby acknowledged, Assignor does hereby irrevocably assign unto Assignee all right, title and interest in and to the Marks and resulting registrations for the United States and throughout the world together with the goodwill of the business in connection with which the Marks are used and which is symbolized by the Marks, along with the right to recover for damages and profits for past infringements thereof; and Assignor further hereby irrevocably assign unto Assignee all right, title and interest in and to the Domains, including renewal, ownership, and administrative rights thereof or any accounts associated therewith;

Assignor agrees to execute and deliver at the request of the Assignee, all papers, instruments, and assignments, and to perform any other reasonable acts the Assignee may require in order to vest all Assignor's rights, title, and interest in and to the Marks and Domains in the Assignee and/or to provide evidence to support any of the foregoing in the event such evidence is deemed necessary by the Assignee, to the extent such evidence is in the possession or control of the Assignor.

**IN WITNESS WHEREOF**, the Assignor has executed this Agreement effective as of the date and year written below.

**ASSIGNOR**

COCOKEFIR LLC, a Minnesota limited liability company

By: ...................................................
Name: Michael Larsen
Title:

**ASSIGNEE**

COCOKEFIR, LLC, a Delaware limited liability company

By: ...................................................
Name: GT Dave
Title: Chief Executive Officer

**TRADEMARK
REEL: 005744 FRAME: 0584**

## ASSIGNMENT OF DOMAIN TRADEMARKS, DOMAIN ADDRESSES & GOODWILL

**WHEREAS,** COCOKEFIR LLC, a Minnesota limited liability company having an address of 716 Tower Drive, Medina, MN 55340, (hereinafter referred to as "Assignor") has registered two (2) trademarks, which are listed in the United States Patent and Trademark Office as set forth on the attached Schedule A (hereinafter referred to as "Registered Marks"), has applied for Federal registration of two (2) trademarks, which are listed in the United States Patent and Trademark Office as set forth on the attached Schedule A (hereinafter referred to as "Applied Marks"), and uses in commerce one (1) trademark which it has not applied for or registered with the United States Patent and Trademark Office as set forth on the attached Schedule A (the "Use Mark"; together with the Registered Marks and the Applied Marks, the "Marks") and is the owner of six (6) internet domain names or accounts associated therewith, which are set forth in the attached Schedule B (hereinafter referred to as "Domains");

**WHEREAS,** CocoKefir, LLC, a Delaware limited liability company having a place of business at 4646 Hampton Street, Vernon, California 90058 (hereinafter referred to as "Assignee") is desirous of acquiring any and all rights that Assignor may have in and to the Marks and the registrations thereof, together with the goodwill of the business in connection with which the Marks are used and which is symbolized by the Marks, along with the right to recover for damages and profits for past infringements thereof; and whereas Assignee is further desirous of acquiring any and all rights that Assignor may have in and to the Domains, including renewal, ownership, and administrative rights thereof or any accounts associated therewith;

**NOW THEREFORE,** for good and valuable consideration, receipt of which is hereby acknowledged, Assignor does hereby irrevocably assign unto Assignee all right, title and interest in and to the Marks and resulting registrations for the United States and throughout the world together with the goodwill of the business in connection with which the Marks are used and which is symbolized by the Marks, along with the right to recover for damages and profits for past infringements thereof; and Assignor further hereby irrevocably assign unto Assignee all right, title and interest in and to the Domains, including renewal, ownership, and administrative rights thereof or any accounts associated therewith;

Assignor agrees to execute and deliver at the request of the Assignee, all papers, instruments, and assignments, and to perform any other reasonable acts the Assignee may require in order to vest all Assignor's rights, title, and interest in and to the Marks and Domains in the Assignee and/or to provide evidence to support any of the foregoing in the event such evidence is deemed necessary by the Assignee, to the extent such evidence is in the possession or control of the Assignor.

**IN WITNESS WHEREOF,** the Assignor has executed this Agreement effective as of the date and year written below.

**ASSIGNOR**

COCOKEFIR LLC, a Minnesota limited liability company

By: _____
　　Name: Michael Larsen
　　Title: Chief Executive Officer

**ASSIGNEE**

COCOKEFIR, LLC, a Delaware limited liability company

By: _____
　　Name: GT Dave
　　Title: Chief Executive Officer

**TRADEMARK**
**REEL: 005744 FRAME: 0585**

STATE OF Minnesota                )
                                  )  ss.:
COUNTY OF Hennepin                )

On the 1 day of March, 2016, before me, the undersigned, personally appeared Michael Trump, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the State of Minnesota, City of Corcoran, and County of Hennepin.

_____
(Signature of individual taking acknowledgement)

JOY R ROSS
Notary Public-Minnesota
My Commission Expires Jan 31, 2018

STATE OF _____        )
                                 )  ss.:
COUNTY OF _____        )

On the ____ day of _____, 2016, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the State of _____, City of _____, and County of _____.

_____
(Signature of individual taking acknowledgement)

**Schedule A**

<u>Registered Marks</u>

Mark: **TULA'S**
Serial Number: 85-129,165
Filing Date: 9-14-10
Class: 32

---

Mark: **COCOYO**
Serial Number: 86-133,856
Filing Date: 12-3-13
Class: 30

---

<u>Applied Marks</u>

Mark: **BELLY BOOST**
Serial Number: 86-691,955
Filing Date: 7-14-15
Class: 005

---

Mark: **COCOKEFIR**
Serial Number: 86-801,644
Filing Date: 10-28-15
Class: 005

---

<u>Use Mark</u>

Mark: **THEA'S**

---

**Schedule B**

<u>Domains</u>

cocokefir.com
cocokefir.info
cocokefir.net
tulacocokefir.com
tulascocokefir.net
what-is-kefir.com