RICK L. SHACKELFORD (SBN 151262)
DANIELL K. NEWMAN (SBN 242834)
RYAN C. BYKERK (SBN 274534)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California  90067
Tel: (310) 586-7700; Fax: (310) 586-7800
E-mail: *ShackelfordR@gtlaw.com*
        *NewmanDK@gtlaw.com*
        *BykerkR@gtlaw.com*

Attorneys for Plaintiff, Lifeway Foods, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFEWAY FOODS, INC., an Illinois corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>MILLENNIUM PRODUCTS, INC., d/b/a GT'S KOMBUCHA / SYNERGY DRINKS, a California corporation; COCOKEFIR LLC, a Delaware limited liability company,<br><br>            Defendants. | Case No. CV 16-7099-R<br><br>Hon. Manuel L. Real<br><br>**PLAINTIFF LIFEWAY FOODS, INC.'S AMENDED MOTION FOR PRELIMINARY INJUNCTION; SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>TIME:        10:00 a.m.<br>DATE:        November 7, 2016<br>LOCATION:  Spring Street Courthouse<br>                   Courtroom 8, 2nd Floor<br><br>Complaint Filed:  September 21, 2016<br>Trial Date:        None Set |

# **Table of Contents**

**Page**

I.    INTRODUCTION ................................................................................1

II.   FACTUAL AND REGULATORY BACKGROUND..........................2

    A.    Regulatory Definition of Kefir.................................................2

    B.    The FDA Cracks Down On The Bogus "CocoKefir" Product ......................5

    C.    Denial of "CocoKefir" Trademark By USPTO ...........................6

    D.    The Bogus CocoKefir Resurfaces ...........................................7

    E.    Defendants Are Misrepresenting The Product To
           The USPTO and FDA ..........................................................11

III.  LEGAL ARGUMENT.......................................................................13

    A.    The CocoKefir Product Is Misbranded ...................................13

    B.    The Misbranded Food Products Cannot Be Legally Sold ...........................17

    C.    California's Sherman Law And The Lanham Act Entitle
           Companies To Sue Competitors For The Sale Of Misbranded
           Food Products.......................................................................17

    D.    The Lanham Act Authorizes Injunctive Relief. .......................18

    E.    Injunctive Relief Is Necessary Here To Prevent
           Defendants From Creating A Market For Their
           Misbranded Products..............................................................19

i

1

IV.    CONCLUSION.................................................................................................23

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abbott Laboratories v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ...................................................................18

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .............................................................19

*Brazil v. Dole Food Co., Inc.*,
   12-CV-01831-LHK, 935 F. Supp. 2d 947, 2013 U.S. Dist. LEXIS 42026,
   2013 WL 1209955 (N.D. Cal., Mar. 25, 2013) ....................................17

*Buzz Bee Toys, Inc. v. Swimways Corp.*,
   20 F. Supp. 3d 483, 510 (D.N.J. 2014)................................................20

*CreAgri, Inc. v. USANA Health Scis., Inc.*,
   474 F.3d 626 (9th Cir. 2007) ...............................................................17

*Fleminger, Inc. v. United States HHS*,
   854 F. Supp. 2d 192 (D. Conn. 2012)..................................................16

*Kosta v. Del Monte Corporation*,
   12-cv-01722-YGR, 2013 U.S. Dist. LEXIS 69319, 2013 WL 2147413
   (N.D. Cal., May 15, 2013) ...................................................................17

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*,
   453 F.3d 377 (6th Cir. 2006) ...............................................................22

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*,
   962 F. Supp. 2d 514 (S.D.N.Y. 2013) ..................................................20

*Playtex Prods. v. P&G*,
   2004 U.S. Dist. LEXIS 14084 (S.D.N.Y. July 26, 2004).....................18

*POM Wonderful LLC v. Coca-Cola Co*,
   134 S. Ct. 2228 (2014).........................................................................18

*Procter & Gamble Co. v. Ultreo, Inc.*,
   574 F. Supp. 2d 339 (S.D.N.Y. 2008) ..................................................20

iii

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
    204 F.3d 1368 (Fed. Cir. 2000) .................................................................12

*Sorenson v. Fein Power Tools*,
    No. 09cv558 BTM (CAB), 2009 U.S. Dist. LEXIS 89105 (S.D. Cal.
    Sept. 28, 2009) .................................................................................................6

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ...................................................................19

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*,
    609 F.3d 975,982 (9th Cir. 2010) ..............................................................19

*United States v. Diaz*,
    690 F.2d 1352 (11th Cir. 1982) .................................................................12

*United States v. Yermian*,
    468 U.S. 63 (1984) .....................................................................................12

*Whitaker v. Thompson*,
    239 F. Supp. 2d 43 (D.D.C. 2003) .............................................................16

**California Cases**

*In Re Farm Raised Salmon Cases*,
    42 Cal. 4th 1077 (2008) .............................................................................17

**Federal Statutes**

18 U.S.C. § 1001 .........................................................................................12

21 U.S.C. § 321 (d) ......................................................................................11

21 U.S.C. § 343(q) .....................................................................................8, 13

21 U.S.C. § 331(a) .......................................................................................17

Federal Food, Drug, and Cosmetic Act, 21 U.S.C.
    § 301 *et seq.* ...............................................................................................13

Food, Drug and Cosmetic Act, 21 U.S.C.
    § 343(a)(1) ...............................................................................................1, 13

Food Drug and Cosmetic Act ...........................................................*Passim*

iv

Fed. R. Evid. 201(b) ................................................................................ 6

Federal Trade Commission Act,
    15 U.S.C. § 41 ............................................................................... 6

Nutrition Labeling and Education Act of 1990,
    21 U.S.C. § 343 *et seq.*, 21 U.S.C. § 343 ................................ 13

Federal Trademark Act of 1946, Lanham Act
    U.S.C. § 1051 ................................................................... 2, 18, 20

**California Statutes**

Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code
    § 109875 *et seq*. ........................................................................ 17


**Other Authorities**

21 C.F.R 101, Subpart A, § 101.14(a)(1) .......................................... 16

21 C.F.R. 101 Subpart A § 101.14(e) ................................................ 16

21 C.F.R. 101, Subpart E. .................................................................. 16

21 C.F.R. § 131.112 (a) ................................................................. 1, 2

21 C.F.R. § 131.112(f) ........................................................................ 3

21 CFR 101.9 ..................................................................................... 12

21 CFR 101.9(b) ........................................................................... 8, 13

21 CFR 101.12(b) ......................................................................... 8, 13

21 CFR 101.36 ................................................................................... 12

21 CFR § 101.4(b) .............................................................................. 8

available online at:
    http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/
    ucm281492.ht ............................................................................. 5

http://www.dictionary.com/browse/kefir ........................................... 15

PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION AND SUPPLEMENTAL
MEMORANDUM OF POINTS AND AUTHORITIES

http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulat ory Information/ucm381189.ht ..................................................................11

http://www.merriam-webster.com/dictionary/kefir ............................................15

http://www.thefreedictionary.com/kefir ............................................................15

https://en.oxforddictionaries.com/definition/us/kefir .......................................15

https://en.wikipedia.org/wiki/Kefir .................................................................15

PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION AND SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES

## SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The case involves renewed efforts by Defendants Millennium Products, Inc. and CocoKefir LLC, (collectively "Defendants") to promote and sell a bogus Kefir product that Defendants peddle as "CocoKefir."  Whatever else may be said about it, the product cannot be called Kefir, because it contains no dairy, and thus, by definition, is not, and cannot be, Kefir.  Accordingly, the product is misbranded and cannot lawfully be sold without violating 403 (a)(1) of the Food, Drug and Cosmetic Act, 21 U.S.C. §343(a)(1).

Plaintiff Lifeway Foods, Inc. ("Lifeway") is the nation's leading manufacturer of genuine ("cultured milk") Kefir products.  Lifeway's Kefir products are all made with cow's milk, and as such meet the definition of "Kefir" set forth in 21 C.F.R. § 131.112 (a) as a "cultured milk product."  Lifeway brings this action to prevent Defendants' bogus "CocoKefir" from remaining in the marketplace, diluting the market for genuine, lawfully-branded Kefir products, and causing harm to Lifeway.

Lifeway further brings this request for a preliminary injunction to prevent the misbranded "CocoKefir" product from being sold through existing outlets or offered for sale to a national market.  A preliminary injunction is necessary because Lifeway will suffer imminent and irreparable harm insofar as the misbranded "CocoKefir" product will dilute the market for genuine, lawfully-branded Kefir products and rob Lifeway of sales and shelf space in the competitive natural foods market.

Lifeway knows whereof it speaks because consumer comments and consumer survey data about the product show that consumers think "CocoKefir" is genuine Kefir and not just non-dairy coconut water.  For example, one such consumer said of the misbranded "CocoKefir" product, *The kefir looks so good*." Plaintiff also commissioned a consumer survey of 890 adults in the continental United States which demonstrated that well over one third of respondents (36.9% to be exact) who were shown a bottle of "CocoKefir" believed that the product contains milk.

This is not the first time the bogus "CocoKefir" product has appeared.  Several years ago, the then-owners of the brand sold "CocoKefir" in interstate commerce through retail stores.  While it was in market, the bogus "CocoKefir" product cut into sales of genuine Kefir products, including those made by Lifeway.  Indeed, "CocoKefir" harmed authentic Kefir brands the entire time it was on the market.  But that time was relatively short-lived, because the Food & Drug Administration ("FDA") sent "CocoKefir's" manufacturer a warning letter in November, 2011, which, among other things, warned that the "CocoKefir" product was misbranded precisely because it did not contain any actual dairy products, and therefore did not meet the legal definition of "Kefir."  Not long thereafter, the "CocoKefir" product disappeared from the market.

But now, under new ownership, the same bogus product is back.  Lifeway has suffered once from having to compete with an illegally misbranded product; it should not have to do so again.  The Lanham Act and California state law both permit a court to restrain or enjoin acts of unfair competition (including the promotion or sale of misbranded foods) based on the same showing.  This Court should exercise that power now and prevent Act Two of this misbranded product's life cycle from proceeding any further.

## II.   FACTUAL AND REGULATORY BACKGROUND

### A.   Regulatory Definition of Kefir

Kefir, by definition, is a cultured milk product that is made with a combination of cultured milk, Kefir grains (a combination of grains, extract and lactic acid bacteria) and other ingredients that are aged in order to produce an end product with higher levels of probiotics compared to non-cultured products.  Genuine Kefir can be made from the milk of cows, goats or sheep but, by definition, the milk must come from animals.

The FDA has established a legal definition of cultured milk in 21 C.F.R. § 131.112(a):

> (a) *Description.* **Cultured milk is the food produced by culturing one or more of the optional dairy ingredients specified in**

2

> **paragraph (c) of this section with characterizing microbial organisms.** One or more of the other optional ingredients specified in paragraphs (b) and (d) of this section may also be added. When one or more of the ingredients specified in paragraph (d)(1) of this section are used, they shall be included in the culturing process. All ingredients used are safe and suitable. **Cultured milk contains not less than 3.25 percent milkfat and not less than 8.25 percent milk solids** not fat and has a titratable acidity of not less than 0.5 percent, expressed as lactic acid. The food may be homogenized and shall be pasteurized or ultra-pasteurized prior to the addition to the microbial culture, and when applicable, the addition of flakes or granules of butterfat or milkfat.

Section 131.112 (emphasis added).

The common and usual name of fermented milk products made in accordance with these definitions is "cultured milk."  As set forth in 21 C.F.R. § 131.112(f), the term "Kefir" may be used to describe products meeting the legal definition of cultured milk. The regulation states:

> (f) *Nomenclature.* The name of the food is "**cultured milk**". The full name of the food shall appear on the principal display panel in type of uniform size, style, and color. The name of the food shall be accompanied by a declaration indicating the presence of any characterizing flavoring as specified in 101.22 of this chapter, and may be accompanied by a declaration such as a traditional name of the food or the generic name of the organisms used, thereby indicating the presence of the characterizing microbial organisms or ingredients, **e.g., "kefir cultured milk"**, "acidophilus cultured milk", or when characterizing ingredients such as those in paragraphs (d) (6), (7), (8), and (9) of this section, and lactic acid-producing organisms are used the food may be named "cultured buttermilk".

Section 131.112(f) (emphasis added).

This "common understanding" is not only a U.S. legal definition (recognized by both the FDA and the USPTO), but also a well-recognized worldwide definition.  At the joint direction of the United Nations' Food and Agriculture Organization ("FAO") and World Health Organization ("WHO"), representatives of more than 180 countries,

3

including the United States, have undertaken to implement food standards in order to "protect[ ] consumers' health and ensur[e] fair practices in the food trade." Codex Alimentarius Comm'n, Procedural Manual, at 20 (23rd ed. 2013). The result of these representatives' efforts is the authoritative Codex Alimentarius, a well-respected registry of food definitions and regulations. The Codex definition of Kefir is almost identical to that of the FDA:

> *Fermented Milk* is a milk product obtained by fermentation of milk, which milk may have been manufactured from products obtained from milk with or without compositional modification as limited by the provision in Section 3.3, by the action of suitable microorganisms and resulting in reduction of pH with or without coagulation (iso-electric precipitation). These starter microorganisms shall be viable, active and abundant in the product to the date of minimum durability. If the product is heat treated after fermentation the requirement for viable microorganisms does not apply.
>
> Certain Fermented Milks are characterized by specific starter culture(s) used for fermentation as follows:
>                                   ….
> **Kefir**: Starter culture prepared from kefir grains, Lactobacillus kefiri, species of the genera Leuconostoc, Lactococcus and Acetobacter growing in a strong specific relationship. Kefir grains constitute both lactose fermenting yeasts (Kluyveromyces marxianus) and non-lactose-fermenting yeasts (Saccharomyces unisporus, Saccharomyces cerevisiae and Saccharomyces exiguus).

Codex Stan 243-2003, § 2.1.

Like the FDA, the Codex sets minimums standards for the presence of dairy ingredients, in this case limiting non-dairy ingredients to 50%:

> *Flavoured Fermented Milks* are composite milk products, as defined in Section 2.3 of the General Standard for the Use of Dairy Terms (CODEX STAN 206-1999) which contain a maximum of 50% (m/m) of non-dairy ingredients (such as nutritive and nonnutritive sweeteners, fruits and vegetables as well as juices, purees, pulps, preparations and preserves derived therefrom, cereals, honey, chocolate, nuts, coffee,

4

> spices and other harmless natural flavouring foods) and/or flavours. The non-dairy ingredients can be mixed in prior to/or after fermentation.

Codex Stan 243-2003, § 2.3.  And, just as in the FDA regulations, the "milk" from which Kefir is made must come from animals, not non-dairy sources like coconuts.

> Milk is the normal mammary secretion of milking animals obtained from one or more milkings without either addition to it or extraction from it, intended for consumption as liquid milk or for further processing.

Codex Stan 206-1999, § 2.1.

Thus, not all cultured milk products are described as "Kefir," but all genuine Kefir products must meet the definition of cultured milk products.  To do so, they must be made from animal milk and contain the requisite levels of milk fat that comes from animal milk and not from other sources.  Thus, by definition, a genuine Kefir product must contain milk from animals:  no animal milk, no Kefir.  Any product called Kefir that does not contain animal milk is misbranded.

### B.   The FDA Cracks Down On The Bogus "CocoKefir" Product

"CocoKefir" was launched in 2009 as a purported Kefir product.  At the time, the brand was owned by CocoKefir LLC, a Minnesota company owned by Michael Larsen.  By November 2011, the company had caught the attention of the FDA because of its illegal marketing claims.  In addition, the FDA informed Larsen and his company that the product was misbranded because it did not meet the legal definition of Kefir.  The FDA's warning letter stated:

> We are concerned that the brand name of the product, "**CocoKefir,**" **may potentially be misleading because it appears to imply that the product is a dairy beverage.  Use of bolding and an alternate font makes the word "Kefir" appear more prominently featured than**

**the word "Coco**." "Kefir" is commonly understood to be a dairy beverage of fermented milk from cows, sheep, or goats.[1]

The deceptive name and misuse of the word kefir was not the only problem the FDA identified with the "CocoKefir" product. The FDA's warning letter *also* warned the makers of "CocoKefir" that, among other things, its product was (1) illegally marketed because the company made therapeutic claims concerning the product without "possess[ing] competent and reliable scientific evidence, including, when appropriate, well-controlled human clinical studies, substantiating that the claims are true at the time they are made," in violation of the FTC Act, 15 U.S.C. § 41; and was (2) misbranded due to serving size violations and inaccurate nutrient content claims, in violation of law. [Miller Decl., Dkt. 6-2, Ex. 1 (FDA Warning Letter)].

## C.    Denial of "CocoKefir" Trademark By USPTO

At the same time that CocoKefir, LLC was trying to fool customers into thinking its product was Kefir, the company was trying to fool the U.S. Patent and Trademark Office ("USPTO") into granting a trademark on the "CocoKefir" name in the "Beverages" category for trademarks. But the USPTO was not fooled. On the contrary, the USPTO **twice** denied original registration of the mark, noting that "The word KEFIR means a creamy drink with a low alcohol content <u>made from fermented cow's milk</u>." (Ex. 1 to this Memorandum of Points & Authorities ("Memo") (USPTO Office Action on CocoKefir application) (emphasis added).)[2]  Indeed, the USPTO file actually includes the

---

[1] The warning letter is attached as Exhibit 1 to the Miller Declaration, Dkt. 6-2. It is also available online at: http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm281492.htm

[2] The Court may take judicial notice of Exhibit 1to this Memorandum because, filings with the USPTO are matters of public record whose accuracy is not subject to reasonable dispute, since their validity can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, i.e., the records of the PTO. Fed. R. Evid. 201(b) (court may take judicial notice of facts "not subject to reasonable dispute" where they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Sorenson v. Fein Power Tools*, No. 09cv558 BTM (CAB),

dictionary definition of "kefir" as "drink of fermented cow's milk: a creamy drink with a low alcohol content made from fermented cow's milk." (12/24/09 Office Action, attaching Microsoft Encarta definition of "Kefir"). After these actions by the FDA and the USPTO, CocoKefir LLC and its product dropped out of the market, and Lifeway hoped that the problem had been solved.

### D.   The Bogus CocoKefir Resurfaces

Unfortunately, however, it appears Defendant Millennium recently acquired the "CocoKefir" brand, with all of its attendant problems and regulatory baggage, in a second attempt to trade on Lifeway's goodwill and products in the Kefir market. According to the U.S. Patent and Trademark Office, the entire interest in the intellectual property rights associated with the brand was assigned to Millennium in March 2016.[3] It also appears that Millennium formed a new Delaware LLC using the CocoKefir name.

The owner may be new, but the 'CocoKefir' product is not – it is the same stuff that the FDA warned about in 2009. Specifically, it is not genuine Kefir, but merely coconut water treated with probiotic bacteria and a non-caloric, non-nutritive sugar substitute, stevia extract. "CocoKefir" now comes in at least three flavors. "CocoKefir Cacao" contains the following ingredients: "young coconut water; probiotic cultures; raw cacao; stevia extract; and 100% pure love." The "CocoKefir Matcha" flavor contains: "young coconut water; probiotic cultures; ceremonial matcha; stevia extract; and 100% pure love." The "CocoKefir Pure" flavor contains: "young coconut water; probiotic cultures; stevia extract; and 100% pure love." None of the flavors contains any dairy or milkfat. Indeed, the labels even boast that the products are "Vegan."[4]

---

2009 U.S. Dist. LEXIS 89105, *1 n. 1 (S.D. Cal. Sept. 28, 2009) (taking judicial notice of PTO documents).

[3] The Court may take judicial notice of Exhibit 2 to this Memorandum because, as filings with the USPTO, they are public records. *See* footnote 2, *supra*.

[4] Although there is currently no definition of "vegan" established by regulation, the common dictionary definition of vegan applies only to foods that do not contain dairy or animal products. "vegan," Merriam-Webster Online Dictionary, 2016,

[Declaration of Rick L. Shackelford at Exhibits 1, 2 and 3.]   All three flavors are available for purchase by consumers in Los Angeles, albeit at the exorbitant price of $10 per 16.2 ounce bottle, at the Café Gratitude.[5]

Beginning in September 2016 (or before), Defendants began strategically "leaking" information about their "CocoKefir" products through influencers on social media.   Specifically, information about the "CocoKefir" products began appearing on Instagram under the handle "shutthekaleup," maintained by food blogger and consumer influencer, Jeannette Ogden, which she claimed she had purchased at a Café Gratitude location.   Ms. Ogden is an example of an "influencer;" influencers have large social media followings and frequently receive compensation from companies to post on social media about their products in order to create consumer interest for those products.   In

---

http://www.merriam-webster.com, Sept. 21, 2016 (*noun*: "a strict vegetarian who consumes no animal food **or dairy products**….") (emphasis added).  Thus, by definition, one can no more have a "vegan kefir" than one could have a "vegan filet mignon." "Vegan kefir" is oxymoronic.

[5] The FDA's 2011 "CocoKefir" warning letter (Miller Decl., Dkt. 6-2, Ex. 1) also stated, "*FDA has determined that your CocoKefir Young Coconut Kefir product is misbranded within the meaning of Section 403(q) of the Act [21 U.S.C. 343(q)] in that the Nutrition Facts panel shown on your website fails to properly declare the serving size as required by 21 CFR 101.9(b) and 101.12(b).  Specifically, serving sizes are determined based on the Reference Amounts Customarily Consumed (RACC), which are provided in 21 CFR 101.12(b).  The Nutrition Facts panel for your CocoKefir Young Coconut product declares the serving size as "1/2 cup," but based on the RACC for beverages, the serving size is 8 oz. (240 ml)*." Defendants' "CocoKefir" products list the serving size as "1/2 cup," not the 8 ounces identified as the appropriate RACC by the FDA, rendering the products misbranded for another reason.  Moreover, the "Cacao" and "Matcha" flavors list only "probiotic cultures," but do not identify the strains of bacteria used as the purported "probiotics."  Unlike the "Pure," flavor, the labels for "Cacao" and "Matcha" do not identify anywhere what strains of bacteria are used; instead, they are merely described as "a proprietary probiotic blend."  Accordingly, these flavors are further misbranded in violation of 21 CFR §101.4(b), due to the failure to identify the name of ingredients in the products.

8

other words, influencers' social media accounts contain a mix of both paid and unpaid content. Content like the posts for "CocoKefir" are a form of advertising.

The Instagram posts and video/photo montages (called "Instastories") featured pictures of the misbranded "CocoKefir" product, showing it to be the same in all respects as the former product.  Notably, the product again communicated Kefir in an unqualified manner.

  

The Instagram post and the comments thereto reflect just the kind of reactions Defendants were paying for:

- "it's kefir so it's an interesting taste.. I'm drinking it though cause it's so good for our gut!"
- "The kefir looks so good"
- "it's interesting since its kefir but good for the gut so I'm in!"
- "I bought the kefir in matcha favor yesterday. Scared to try it tho. Lol"
- "I'm eying that coco kefir . . . need to find that when I'm home."
- "That cocokefir sounds absolutely delish I must try."
- "whaaaaat I wanna try the cocokefir."
- "Nooo way. I have to try the cocokefir."

9

- "Can we spend our Sunday trying to find this cacao coco kefir?"
- "I need to find that cocokefir."
- "Been dyinggg for some coco Kefir!!  So excited GT makes it. ..But now I have to find it."
- "The kefir looks so good"
- "Your candid response to the kefir is exactly what I thought it would be... 'It's actually disgusting.'"
- "I'm still drinking it! so good for us!"
- "kefir helps with sealing your gut and if you have a healthy gut everything else should be in line."

[True and correct copies of the comments to Ms. Ogden's Instagram post are attached as Exhibit 2 to the declaration of Derek Miller filed with the original Motion, Dkt. 6-2.]

This is exactly the kind of "buzz" a company pays for.  It is cheap, fast, and affords a real world platform to place before retailers in order to persuade them to carry a new product.  These comments plainly show that consumers mistakenly think "CocoKefir" is genuine Kefir, not the non-dairy coconut water fortified with probiotics that it actually is.

Consumer survey evidence also confirms that consumers are deceived.  Plaintiff commissioned an online survey, conducted by Google Consumer Surveys, of 890 American adults in the 48 contiguous states.  [*See* Shackelford Decl., Ex. 6 (consumer survey summary)].  Survey respondents were presented the following inquiry:

**Kefir** is commonly understood to be a dairy beverage of fermented milk from cows, sheep, or goats. Does the product below contain milk?



☐ Yes the product contains milk

☐ No the product does not contain milk

10

The order of appearance of the response options (Yes or No) was randomized, such that each choice would appear first roughly an equal percentage of the time.  The survey showed that 36.9% of those surveyed answered in the affirmative, reflecting the mistakenly impression that "CocoKefir" contains milk when it does not.

### E.   Defendants Are Misrepresenting The Product To The USPTO and FDA

In addition to fooling consumers and competing unfairly with Lifeway, Defendants are taking deceptive – and contradictory – positions about the nature of the product to the FDA and the USPTO.

In the United States, a product cannot simultaneously be both a food and a dietary supplement.  According to the FDA, products classified as "beverages are conventional foods that may not be marketed as dietary supplements." *Food and Drug Administration Guidance for Industry: Distinguishing Liquid Dietary Supplements from Beverages*, January 2014 (referred to hereinafter as "*FDA Guidance re Supplements vs. Beverages*").[6]  In fact, the FDA specifically warned CocoKefir (Minnesota) about this:

> If these products are **labeled as dietary supplements, they cannot also be represented for use as conventional foods** because a product intended for use as a conventional food is not a dietary supplement. **Such labeling would misbrand the products** within the meaning of section 403(a)(1) of the Act, 21 ULS.C. § 343(A)(1), in that the labeling would be **false and misleading**."[7]

Having been duly warned by the FDA to make a choice, Defendants chose to label CocoKefir as a food.  For example, the CocoKefir labels reflect that the products are

---

[6] http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatory Information/ucm381189.htm. The Food Drug and Cosmetic Act ("FDCA") defines "food" as "(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article." 21 U.S.C. 321 (d).  The FDCA defines a "dietary supplement" as a product that, among other things, "is not represented for use as a conventional food or as a sole item of a meal or the diet" and that is labeled as a dietary supplement. *Id*. at 321(ff)(2)(B) and (C).

[7] 11/6/2012 Warning letter, Miller Decl., Dkt. 6-2, Ex.1 (emphasis added).

11

being marketed as food.  As the FDA put it, "[p]roducts in liquid form can be represented as conventional foods as a result of factors such as their product or brand name, packaging, serving size and total recommended daily intake (i.e., the volume in which they are intended to be consumed), composition, recommendations and directions for use, statements or graphic representations in labeling or advertising, and other marketing practices."  *FDA Guidance re Supplements vs. Beverages* at III(A).  In each of these areas, Defendants have represented that the CocoKefir products are beverages, not dietary supplements.  For example, beverages, like all foods, must comply with the FDCA labeling regulations, including the requirement to include nutrition information in a "Nutrition Facts" panel.  21 CFR 101.9.  By contrast, dietary supplements are required to display such information in a "Supplement Facts" panel.  21 CFR 101.36.   Here, CocoKefir labels all display a "Nutrition Facts" panel not a "Supplement Facts."  In other words, Defendants are telling the FDA and consumers that CocoKefir is a food, not a dietary supplement.

But these same Defendants, *at the same time*, have represented to the USPTO that CocoKefir is in the class of:  "**Dietary and nutritional supplements containing kefir**." (Memo Ex. 3 (October 28, 2015 USPTO file) at pp 1, 17, 20, 23, 25, 32 and 34.)    No doubt, after the USPTO's prior denial of the mark in the "Beverage" class, Defendants told the USPTO a different story.  In other words, in order to be able to sell a bogus product, Defendants are simultaneously telling one federal agency that CocoKefir is a food, not a supplement – and telling another federal agency the exact opposite, that it is a supplement.  This violates Defendants' duties to act truthfully and consistently in seeking federal regulatory approval for their products and labels.  *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1373 (Fed. Cir. 2000) (applicants have a "duty of candor, good faith, and honesty" to USPTO); *United States v. Diaz*, 690 F.2d

12

1352, 1358 (11th Cir. 1982) (false statements to FDA are criminally punishable under 18 U.S.C. 1001).[8]

And it is actually worse than this.  Defendants are telling consumers a **third** thing, namely that CocoKefir is a beverage but that it also has health benefits like a dietary supplement.  Specifically, Defendants' product label makes an unmistakable health claim by stating that the product "supports healthy digestion."  (Shackelford Decl., Exhibits 1, 2 and 3.)  This health claim was never approved by the FDA, and Defendants know it.

As set forth below, these products, which are deceptively marketed and labeled as Kefir but yet contain no milk, are the archetype of "misbranded" food and cannot lawfully be sold.  Moreover, these deceptions practiced by Defendants are knowing and deliberate, not accidental, and represent a pattern of fraudulent behavior that needs to be reined in by the immediate issuance of an injunction.

## III.   LEGAL ARGUMENT

### A.   The CocoKefir Product Is Misbranded

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*., as amended by the Nutrition Labeling and Education Act of 1990 ("NLEA"), 21 U.S.C. § 343 *et seq*., 21 U.S.C. § 343 establishes the conditions under which food is considered "misbranded." Food is misbranded under 21 U.S.C. § 343(a)(1) if "its labeling is false or misleading in any particular."

In this case, once Lifeway learned of Defendants' efforts to launch the misbranded "CocoKefir" product, Lifeway took steps to learn whether the brand's new owners had learned anything from the FDA's 2011 warning letter with regard to the misbranding of the product.[9]  In particular, Lifeway tried to learn whether this "new" product contains

---

[8] *See also* 18 U.S.C.S. § 1001; *United States v. Yermian*, 468 U.S. 63, 64 (1984) ("It is a federal crime…to make any false or fraudulent statement in any matter within the jurisdiction of a federal agency");

[9] It is apparent that Defendants did not learn any lessons from the warning letter.  In addition to the warning about "Kefir," the FDA also warned that "CocoKefir" was misbranded because of the "serving size" stated in the product's nutrition facts panel.

13

sufficient milk to meet the standard of identity for a cultured milk product.  It attempted to deliver a cease and desist letter to Defendants calling out the misbranding.  Defendants had a perfect opportunity to respond to that letter and to set the record straight if, in fact, their new product was not misbranded.  But Defendants refused to sign for the registered letter.

Not until after Lifeway's *ex parte* Application was filed did Lifeway actually receive a response to Lifeway's cease and desist letter.[10]  But the response letter only confirmed that Defendants' product was misbranded.  Indeed, the letter does not dispute that the "CocoKefir" product contains no milk, but rather, it argues contrary to the FDA, USPTO, Codex Alimentarius, and other authorities, that "the term 'kefir is commonly understood as a probiotic culture and not as a term specific to milk-based beverages." [Shackelford Decl., Ex. 5.]  The sole authority Defendants' counsel cited in opposition to the FDA, USPTO, Codex understandings is an Internet search.  [*Id.* ("a simple search of the word 'kefir' on the Internet yields a myriad of references to a kefir as a variety of beverages containing probiotic bacterium and yeasts in traditional kefir grains or similar species to these.").]

Tellingly, Defendants fail to cite a single web site URL to support their dubious conclusions that Kefir can be anything but a milk product.  But moreover, Defendants'

---

The FDA's warning letter stated: "FDA has determined that your CocoKefir Young Coconut Kefir product is misbranded within the meaning of Section 403(q) of the Act [21 U.S.C. 343(q)] in that the Nutrition Facts panel shown on your website fails to properly declare the serving size as required by 21 CFR 101.9(b) and 101.12(b).  Specifically, serving sizes are determined based on the Reference Amounts Customarily Consumed (RACC), which are provided in 21 CFR 101.12(b).  The Nutrition Facts panel for your CocoKefir Young Coconut product declares the serving size as "1/2 cup," but based on the RACC for beverages, the serving size is 8 oz. (240 ml)." [Miller Decl., Dkt. 6-2, Ex. 1.]  The "serving size" on the "CocoKefir" currently in market is still listed as "1/2 cup." [Shackelford Decl., Exs. 1, 2 and 3.]

[10]Defendants claim that the letter (attached as Exhibit 5 to the Declaration of Rick L. Shackelford) was faxed to Lifeway by Defendant's counsel, Allan Fanucchi.  Lifeway has no record of ever receiving the letter by fax or any other medium.

14

contention is demonstrably false.  A Google search for "Kefir definition" brings up a Google-curated definition of "a sour-tasting drink make from <u>cow's milk</u> fermented with certain bacteria"[11] The other search results also all confirm that definitions of "Kefir" all refer to its milk/dairy content.  Dictionary.com defines the word "kefir" as "a tart-tasting drink originally of the Caucasus, made from <u>cow's or sometimes goat's milk</u> to which the bacteria Streptococcus and Lactobacillus have been added."[12]  Mirriam-webster.com defines Kefir as "a beverage of fermented <u>cow's milk</u>."[13]  Wikipedia defines Kefir as "a fermented <u>milk drink</u> made with kefir 'grains.'"[14]  Thefreedictionary.com defines Kefir as "[a] creamy drink made of fermented <u>cow's milk</u>."[15]  Oxforddictionaries.com defines Kefir as "a sour-tasking drink make from <u>cow's milk</u> fermented with certain bacteria."[16] Indeed, each reputable web site defines the term Kefir consistent with FDA and Codex standards.  Finally, even if Defendants could provide URLs to support their conclusion, Defendants' ability to cull some reference to non-dairy Kefir from the Internet is of no moment, and if anything, further proves Lifeway's point – that due in part to Defendants' efforts, confusion is being generated in the marketplace as between Kefir and misbranded non-dairy, non-Kefir knock-off products like "CocoKefir."

Defendants' response letter all but confirms that this "new" product is the same misbranded "CocoKefir" that the FDA addressed in its letter in 2011, but now is being marketed by a different owner.  "CocoKefir" has no milk.  It is misbranded.

Though this would be enough to show misbranding, CocoKefir is *also* misbranded because it makes an unapproved health claim.

---

[11] Google.com, search "Kefir definition." (emphasis added).

[12] http://www.dictionary.com/browse/kefir (emphasis added).

[13] http://www.merriam-webster.com/dictionary/kefir (emphasis added).

[14] https://en.wikipedia.org/wiki/Kefir (emphasis added).

[15] http://www.thefreedictionary.com/kefir (emphasis added).

[16] https://en.oxforddictionaries.com/definition/us/kefir (emphasis added).

15

FDA regulations define a "health claim" as follows:

> Health claim means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (e.g., a brand name including a term such as "heart"), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition.  Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition.

21 C.F.R 101, Subpart A, §101.14(a)(1). The FDCA sets forth specific requirements for making a health claim, listing sixteen categories of permissible health claims, and the particular requirements for each type of claim. 21 C.F.R. 101, Subpart E.   More importantly, the FDCA is unequivocal that unapproved claims are prohibited:

> *Prohibited health claims*. No express or implied health claim may be made on the label or in labeling for a food, regardless of whether the food is conventional food form or dietary supplement form, unless: (1) The claims is specifically provided for in subpart E of this part; and (2) The claim conforms to all the general provisions of this section as well as to all specific provisions in the appropriate section of subpart E of this part…

21 C.F.R. 101 Subpart A §101.14(e).   "Under the FDCA, a food labeled with an unauthorized health claim may be considered a misbranded food." *Fleminger, Inc. v. United States HHS*, 854 F. Supp. 2d 192, 197 (D. Conn. 2012) (citing 21 U.S.C. § 343(r)).[17] When a product makes unqualified health claims – without disclaimers, as here – the claim must be approved by the FDA based on "significant scientific agreement." *Id.* at 200.   Claims that are not supported by "significant scientific agreement" but

---

[17]  The FDA has the power to regulate health claims. *Whitaker v. Thompson*, 239 F. Supp. 2d 43, 50 (D.D.C. 2003) ("Congress created a framework for authorization of health claims but also delegated full authority to the FDA to adopt whichever standard the agency deemed most appropriate for approving such claims.").

16

supported by "credible evidence" are considered "qualified" health claims, and require "corrective disclaimers to the claim to reflect the scientific record." *Id.*

Here, Defendants' product label makes an express health claim by stating that the product "supports healthy digestion," a claim that does not comply with any of the 16 categories of permissible health claims in 21 C.F.R. 101, Subpart E and, in fact, is not provided for anywhere in the statute. The claim is not FDA approved even for genuine kefir products, much less for bacteria-infused coconut water.   The FDA has not recognized any "significant scientific agreement" to support Defendants' claim. Moreover, the claim is not qualified with any disclaimer as would be required for the claim to constitute a qualified health claim permitted by the FDA. Accordingly, for each of these reasons, Defendants' "CocoKefir" product is clearly misbranded.

### B.    The Misbranded Food Products Cannot Be Legally Sold

Misbranded products cannot legally be sold, and are even subject to being seized. 21 U.S.C. § 331(a) (prohibiting in interstate commerce "any food…that is…misbranded"); *id.* at § 332(a) (federal courts have authority to grant injunctive relief to enforce the FDCA); *id.* at § 334(a) (federal courts have authority to order seizure of misbranded products); *see also CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007) (sale of misbranded goods unlawful).  As described above, the FDCA sets forth the specific standard of identity for cultured milk products like Kefir, including the (rather obvious) requirement that cultured milk be dairy, not non-dairy.  "CocoKefir" does not satisfy that standard of identity and cannot be legally sold as "Kefir" in the United States.

### C.    California's Sherman Law And The Lanham Act Entitle Companies To Sue Competitors For The Sale Of Misbranded Food Products.

The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 *et seq.*, incorporates the requirements of the FDCA as the food labeling requirements of the state of California.  Courts in this state have repeatedly affirmed the principle that a requirement imposed by state law that effectively parallels or mirrors the

17

relevant sections of the FDCA may be enforced by private action in California.  *See e.g. In Re Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1084, n.5 (2008); *Brazil v. Dole Food Co., Inc.*, 12-CV-01831-LHK, 935 F. Supp. 2d 947, 2013 U.S. Dist. LEXIS 42026, 2013 WL 1209955 (N.D. Cal., Mar. 25, 2013) (holding that the FDCA did not preempt identical provisions under the Sherman Law); *Kosta v. Del Monte Corporation*, 12-cv-01722-YGR, 2013 U.S. Dist. LEXIS 69319, 2013 WL 2147413 (N.D. Cal., May 15, 2013) (same).   A competitor, in particular, has an interest in bringing an action to insure that misbranded foods are not sold, particularly where such sale will cause the innocent competitor harm.

Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) also authorizes an action against a competitor for misbranding or false advertising, which action is completely distinct from an action under the Sherman Law to enforce a violation of the FDCA.  As the United States Supreme Court held in *POM Wonderful LLC v. Coca-Cola Co.:*

> [T]he FDCA and the Lanham Act complement each other in the federal regulation of misleading food and beverage labels. Competitors, in their own interest, may bring Lanham Act claims [] that challenge food and beverage labels that are regulated by the FDCA.

*POM Wonderful LLC v. Coca-Cola Co,* 134 S. Ct. 2228, 2233 (2014).

The Supreme Court held that a competitor has the right to pursue an action against a competitor who "[makes a] false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, qualities, or geographic origin of [] goods, services, or commercial activities." *Id*. at 2234.  "This principle reflects the Lanham Act's purpose of protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition." *Id*. (internal quotations omitted).  It is under this principle that Lifeway brings the instant action.

### D.   The Lanham Act Authorizes Injunctive Relief.

Under the Lanham Act, once a violation of the statute is demonstrated, injunctive relief can issue.  15 U.S.C. § 1125(a); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992) (injunction proper for product falsely advertised as rice-based

18

when it was not made with rice); *Playtex Prods. v. P&G*, 2004 U.S. Dist. LEXIS 14084 (S.D.N.Y. July 26, 2004); The Supreme Court has recognized the importance of equipping companies with the ability to enjoin a competitor's deceptive labeling, rather than relying solely on the FDA to police the marketplace. *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. at 2239 ("Because the FDA acknowledges that it does not necessarily pursue enforcement measures regarding all objectionable labels, if Lanham Act claims were to be precluded then commercial interests—and indirectly the public at large—could be left with less effective protection in the food and beverage labeling realm than in many other, less regulated industries." (footnote omitted)).

**E.** **Injunctive Relief Is Necessary Here To Prevent Defendants From Creating A Market For Their Misbranded Products.**

Injunctive relief is necessary and appropriate here: Defendants have already been told by the FDA that their "CocoKefir" products are deceptively labeled and misbranded. Nevertheless, with full knowledge of the problems and with no attempt to cure them, Defendants have re-introduced the products into the consumer market. The only thing that has changed is the way the products were described to the USPTO for purposes of gaining a trademark. Accordingly, for the protection of Lifeway's market, brand and goodwill, Lifeway seeks and is entitled to injunctive relief requiring Defendants to immediately cease the advertising, sale and distribution of "CocoKefir" and all other non-dairy products that purport to be or incorporate the name Kefir.

To be entitled to injunctive relief Lifeway must establish: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that the injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975,982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365,374 (2008)). "[T]he elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

19

As shown, the facts here easily satisfy this test.

### 1. Lifeway is likely to prevail on the merits.

In order to obtain a preliminary injunction, Lifeway must show that its claim is likely to succeed on the merits.  Based on the evidence already adduced, this is a straightforward proposition.  First, Lifeway must show unlawful conduct by a competitor, which is shown by virtue of the misbranded "CocoKefir."  *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  Then Lifeway must show a "likelihood of confusion" on the part of a substantial number of consumers.  This, too, has been shown by virtue of consumer survey evidence and the consumer "comments" in response to social media posts advertising the "CocoKefir" product.  The consumer survey conducted by Google Consumer Surveys, revealed that 36.9% of consumers plainly believe that the product is Kefir and not just enhanced coconut water.  Shackelford Decl., Ex. 6.  This rate of deception far exceeds the national standard in Lanham Act cases, that holds that deception rates of 20% or greater are sufficient evidence of deception.  *See Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008) ("Cases have held that 20% constitutes a substantial percentage of consumers.") (citing *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer, Pharms, Inc.*, 19 F.3d 125, 134 n.14 (3d Cir. 1994)).  The survey evidence and the consumer comment evidence reflecting that Defendants' advertising has already produced the desired effect is more than sufficient to establish likely confusion and shows that Lifeway is likely to succeed on its claim.

### 2. Lifeway is likely to suffer irreparable and imminent harm in the absence of preliminary relief.

Unless Defendants are enjoined, Lifeway will immediately suffer irreparable harm.  "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."  *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 510 (D.N.J. 2014) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004)).  "To demonstrate irreparable harm in a Lanham Act case, a party 'must show two

20

things: (i) that the parties are competitors in the relevant market, and (ii) that there is a logical causal connection between the alleged false advertising and its own sales position.'" *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 518 (S.D.N.Y. 2013) (quoting *CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011)).

First, Lifeway and Defendants are competitors in the marketplace. Lifeway is the leading manufacturer of genuine Kefir products in the United States, and Defendants have begun marketing and selling misbranded products that falsely purport to be Kefir. These products compete for the same scarce shelf space in retail stores, as well as for consumers seeking genuine Kefir.

Second, there is a logical, causal connection between Defendants' false advertising and Lifeway's sales position. Defendants have already been distributing and selling the "CocoKefir" products, and, according to their attorney's letter, they "will not cease and desist in its use of the term Kefir as an element in its trademark…and its communications materials" [Shackelford Decl., Ex. 5], even after having been apprised of applicable law.

Defendants' continued marketing and sale of its bogus "CocoKefir" product is likely to deceive reasonable consumers, including retailer buyers, brokers, and distributors into believing the "CocoKefir" non-dairy product is genuine Kefir, creating a market for Defendants' misbranded products. Defendants' products, which are not Kefir, will compete for shelf space with Lifeway's genuine Kefir. Defendants' conduct will confuse consumers who purchase "CocoKefir" reasonably believing they are getting genuine Kefir products when they are not. Unless enjoined, Defendants will obtain a wrongful and unfair competitive advantage, because they will undercut Lifeway's market, causing Lifeway to lose sales of its genuine Kefir to Defendants' misbranded non-dairy coconut water. Unless Defendants are enjoined, retailer buyers, brokers, distributors, and eventually, consumers will be confused, the meaning of genuine Kefir will be diluted, and Lifeway will lose the goodwill associated with thirty years of creating, developing and marketing its Lifeway Kefir brand. Lifeway is the company

21

that first brought Kefir to the United States.  Lifeway created the market for Kefir and the loss of thirty years' of goodwill in the marketplace would be irreparable for Lifeway. Moreover, this loss of goodwill and market share is imminent.  It has already begun, with Defendants' sale and marketing of the "CocoKefir" product, and its continued sale and marketing and sale will have far-reaching effects that will be difficult or impossible to measure.  If unchecked, Lifeway's harm will grow and worsen as "CocoKefir" achieves greater distribution through multiple channels beyond Café Gratitude.

### 3.     The balance of equities tips in Lifeway's favor.

The harm to Lifeway in this matter is irreparable, for the reasons explained above, and thus, the balance of equities tips in its favor.  But moreover, Defendants here would suffer no legally recognizable harm, because the requested relief is narrowly tailored to enjoin only the marketing and distribution *of an unlawful product*, in which Defendants have no legal or legitimate interest in selling in the first instance.  Even assuming Defendants would suffer harm – and to be clear, they would not – any such harm would be compensable via monetary damages.  Thus, on balance, this factor militates in favor of entering the requested injunction.

### 4.     The injunction is in the public interest.

An injunction against the sale of a non-Kefir product that is deceptively named and labeled "CocoKefir" is in the public interest because it would prevent the sort of consumer confusion and deception in the marketplace (of the type already evidenced by the above-detailed Instagram comments), and it would protect Lifeway's goodwill in the marketplace.  *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006) ("an injunction against the sale of counterfeit [goods] would advance two fundamental purposes of trademark law: preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark").

22

## IV.    <u>CONCLUSION</u>

On the basis of the foregoing, Lifeway respectfully urges this Court to grant its Motion for Preliminary Injunction against Defendants.


Dated:  October 10, 2016         GREENBERG TRAURIG, LLP


By: _____*/s/ Rick. L. Shackelford*_____
Rick L. Shackelford
Daniell K. Newman
Ryan C. Bykerk
Attorneys for Plaintiff
Lifeway Foods, Inc.